## CAMPBELL SOUP CO. et al. v. DIEHM et al.

### Civ. Nos. 14183–14186.

United States District Court
E. D. Pennsylvania.

Sept. 26, 1952.

Dilworth, Paxson, Kalish & Green, Philadelphia, Pa., for plaintiffs.

William F. Quinlan, Philadelphia, Pa., for defendant Lester C. Martin.

No appearance for defendants Howard Diehm and others.

WELSH, District Judge.

The actions herein were brought by plaintiffs to enjoin certain tomato farmers, who are under contract to sell their crops to the plaintiffs, from breaching their contracts, or to enjoin certain brokers from inducing or participating in the breaching of the farmers' contracts.

Temporary restraining orders were issued by this Court in each action on September 9th, and were renewed on September 11th and again on September 18th.

It was agreed and stipulated by counsel that the actions be tried upon the following case stated and that they be heard on said case stated as if on final hearing.

#### Case Stated.

Both of the plaintiffs are corporations organized and existing under the laws of the State of New Jersey, with their principal place of business at Camden, New Jersey, and they are citizens of the State of New Jersey.

All of the defendants are citizens of the State of Pennsylvania.

Defendants Lester C. Martin, Joseph Loch, Frank W. Loch and Phares B. Stauffer are farmers and growers of tomatoes.

Defendants Howard Diehm and Samuel Barrage are duly licensed brokers author-

ized to buy and sell agricultural products in the State of Pennsylvania.

The written contracts, entered into between the four defendant farmers and Joseph Campbell Company are attached hereto, made a part hereof, and marked Exhibit A (1–4):

These contracts were offered to the defendant growers by agents of the Joseph Campbell Company at their domiciles, were there signed by defendants, were then forwarded to the Joseph Campbell Company at its offices in Camden, New Jersey, were there signed by that company, and a copy was then mailed to the defendant growers.

Defendant Lester C. Martin signed for 10 acres of tomatoes for the 1952 season but planted not less than 20.3 acres (see Exhibit A–1).

Defendants Joseph Loch and Frank W. Loch signed for 15 acres of tomatoes for the 1952 season, but planted only 11.6 acres (see Exhibit A–2 and 3).

Defendant Phares B. Stauffer signed for 10 acres of tomatoes for the 1952 season but planted 12.3 acres (see Exhibit A–4).

It is estimated that the yield per acre is approximately 8 tons per acre for the 1952 season, and the average contract price for such tonnage will be approximately $30 per ton. The open market price for the tomatoes in question for the 1952 season has averaged approximately $50 per ton.

The Campbell Soup Company has for many years engaged in the canning of soups and other food products in its plant in Camden, New Jersey, including such tomato products as soup, juice and catsup. For this purpose the Campbell Soup Company operates in Camden, New Jersey, a large factory where it employs 7,000 men at the height of the canning season, this factory being equipped with machinery for the work of manufacturing and packing these products.

The Campbell Soup Company cans and packs each year during the tomato season, which is roughly from August 1st to the end of September, very large quantities of these tomato products, its capacity being more than 250,000⅝ bushel baskets of to-matoes every day. Its sales of tomato products run into millions of dollars each year.

The Campbell Soup Company's production of these tomato products is in accordance with a carefully devised schedule, based upon a steady flow of tomatoes of certain kinds and qualities. The Campbell Soup Company, in order to secure the desired quantity of tomatoes at fixed prices and in a steady flow of the desired qualities, necessary to assure uniformity of quality and price in the finished product, contracts with the Joseph Campbell Company (see Exhibit B) for growers in Pennsylvania, Delaware and Maryland, and with the growers themselves in New Jersey. These contracts are entered into in March of each year immediately prior to the planting season, and five months prior to the tomato canning season.

The Campbell Soup Company, which is the manufacturer, has entered into a contract with the Joseph Campbell Company, a true and correct copy of which, including the supplement thereto, is attached hereto, made a part hereof, and marked Exhibit B.

The capital stock of the Joseph Campbell Company and of the Campbell Soup Company, is wholly owned by the Estate of John T. Dorrance, and the Joseph Campbell Company was created to procure raw materials for the Campbell Soup Company.

At or about the same time that contracts are made with the tomato growers by the Joseph Campbell Company, the Campbell Soup Company plans for its Fall production on the basis of the estimated contract crop. It orders the necessary tin plate for containers, the necessary labels for the containers, cases for the containers, and makes arrangements with the Continental Canning Company for the rental of sufficient machinery to handle the canning. It also makes its contract with the Labor Unions for the necessary supply of labor, purchases the other ingredients to be mixed with the tomato products in the quantities necessary to meet the estimated needs. Contracts are let for advertisement, based on a percentage of the estimated amount of tomatoes to be canned. The Campbell Soup Company also enters into contracts at this

time with dealers all over the world, at set prices for the sale to said dealers of well over half of its estimated production of canned tomato products.

Picked tomatoes are highly perishable and cannot be stored. Consequently they are processed and canned immediately upon delivery and then shipped directly to the dealers who have contracted for them.

The Campbell Soup Company, at its experimental farm in New Jersey, developed varieties of tomatoes most suitable for its canning purposes, and it grows the plants for these varieties at its farms in Georgia. These plants are available for sale to farmers contracting to grow tomatoes. These plants are sold to the farmers by the Joseph Campbell Company and the Campbell Soup Company, on credit, payment therefor being deducted when the tomatoes are delivered at the loading stations.

Defendant Samuel Barrage has made it a practice also to sell plants to farmers on credit, deducting the price from deliveries, and did sell to the following defendants in 1952—Phares Stauffer, 16,400 plants, $85.50; Lester C. Martin, 22,000 plants, $134.

Barrage has also made it a practice to furnish baskets to farmers on credit as above, and has furnished 2,150 baskets to the following defendants in 1952—Lester C. Martin, 2,000; Phares Stauffer, 150.

Defendant Lester C. Martin purchased from the Joseph Campbell Company for the 1952 planting season 88,100 plants at a total cost of $452.45.

Defendants Joseph Loch and Frank W. Loch purchased from the Campbell Soup Company for the 1952 planting season 51,-450 plants at a total cost of $270.12.

Defendant Phares B. Stauffer purchased from the Joseph Campbell Company for the 1952 planting season 30,450 plants at a total cost of $158.82.

It is estimated that a farmer plants from 3,000 to 3,600 plants per acre.

The Campbell Soup Company makes a free soil analysis available to farmers who contemplate entering into contracts with the Joseph Campbell Company, and also makes available to farmers who have entered into such contracts, free technical advice on problems relating to the planting, fertilizing, culture, spraying and harvesting of their tomato crops, including a free monthly bulletin entitled "News and Views from Campbell".

Contracts are entered into by the Joseph Campbell Company with farmers in widely diversified areas with a view to avoiding regional crop failures and also so that by geographical alignment of the contracts a successive period of ripening will result so as to make the flow of tomatoes to the canning plant more evenly distributed over the seven or eight week canning period. Deliveries to plaintiffs this year have been less than half the anticipated supply from contract growers.

All the defendant farmers have been picking tomatoes from their entire acreage since the first week in August, but made no deliveries to plaintiffs until August 20th, when the defendants Joseph Loch and Frank W. Loch delivered one load of tomatoes, weighing approximately 7 tons.

The defendants Lester C. Martin and Phares B. Stauffer made no deliveries to plaintiffs until September 4th, when Martin delivered a load weighing approximately one and one-half (1½) tons, and Stauffer a load weighing approximately four (4) tons. The total amount of tomatoes delivered to plaintiffs by the defendant growers up to and including September 9th is as follows:

Lester C. Martin—September 4th, 1½ tons
September 5th, 4½ tons
Joseph Loch and Frank W. Loch—August 20th, 7 tons (rejected)
Phares B. Stauffer—September 4th 4 tons.

All of the defendant growers during the aforesaid period sold a substantial portion of the tomatoes picked from their acreage to buyers other than the plaintiffs.

The defendants Barrage and Diehm had knowledge that some of the growers, including the defendants Martin and Stauffer, from whom they were buying tomatoes at the market price, had written agreements with the Joseph Campbell Company.

## Discussion.

### A. Jurisdiction.

The diversity of citizenship between the plaintiffs and defendants is not in dispute. Each of the defendants, however, challenges the jurisdiction of this Court on the ground that the amount in controversy in each case does not exceed $3,000 exclusive of interest and costs. The defendants' theory is that the amount in controversy is to be measured by the quantity of tomatoes covered by each defendant's contract.

The theory would be tenable if the actions herein were for specific performance of sales contracts, since the rule is that in an action for specific performance alone the actual value of the property involved is the correct measure of the amount in controversy. But it is plain that the injunctive actions herein involve much more than simple specific performances of sales contracts. They involve a carefully planned system of doing business which has been placed in jeopardy by the conduct of the defendants.

It has been the rule since the decision of the Supreme Court of the United States in the case of Glenwood Light and Water Company v. Mutual Light, Heat and Power Company, 239 U.S. 121, 36 S.Ct. 30, 60 L.Ed. 174, that in a suit for an injunction, the amount in controversy is determined by the value of the object to be gained by the plaintiff. The United States Court of Appeals for the Third Circuit, in John B. Kelly, Inc., v. Lehigh Navigation Coal Company, Inc., 151 F.2d 743, followed this rule by holding that the test of the jurisdictional amount is the value of the right that is to be protected.

The rights that the plaintiffs are endeavoring to protect in the present injunctive actions consist of a plan of doing business and a vast system of manufacture, which are fully described infra and which are being attacked by the conduct of all of the defendants. Obviously, the value of these rights by far exceeds the jurisdictional requisite.

We conclude, therefore, that the amount in controversy exceeds $3,000 exclusive of interest and costs and that this Court has jurisdiction.

### B. Campbell Soup Company as a Proper Party-Plaintiff.

While it is true that Campbell Soup Company is not a party to the contracts between the defendant farmers on the one hand and Joseph Campbell Company on the other it is nevertheless clear that said Campbell Soup Company is a third-party beneficiary of the contracts. The foregoing is so whether New Jersey or Pennsylvania law is applicable. See Werner v. Kent Parking Garage, Inc., 133 N.J.L. 104, 42 A.2d 707; Logan v. Glass, 136 Pa.Super. 221, 7 A.2d 116 and Barratt v. Greenfield, 137 Pa.Super. 310, 9 A.2d 188.

The facts and circumstances which, we think, confer on Campbell Soup Company the status of third-party beneficiary are mentioned or discussed below.

Aside from the fact that it is obvious that all deliveries were to be made for the benefit of the Campbell Soup Company, the contracts themselves make this fact explicit by providing in paragraph 6: "Campbell shall not be obligated to purchase any tomatoes it cannot deliver to Campbell Soup Company or which Campbell Soup Company cannot receive or use at its Camden, New Jersey plant because of any of those contingencies."

Many of the benefits which accrue to the farmers when they enter into these contracts—such as the right to purchase tomato plants at low cost, the right to free soil analysis and consultation concerning plant and crop diseases—come to the farmers direct from the Campbell Soup Company.

The whole aim of the tomato contracts, we think, is directed to production in the plant of Campbell Soup Company, and no one connected with the transactions could possibly conceive that the tomatoes would go anywhere else.

From the facts disclosed above it is not unreasonable, we think, to conclude that the Campbell Soup Company is the real party in interest. As such, under the Rules it has the right to bring these actions, and is therefore a proper party-plaintiff. (Under

the Federal Rules Joseph Campbell Company which entered into the contracts on behalf of the Campbell Soup Company has the right to join in these actions and is therefore a proper party-plaintiff.)

## C. Conscionability of the Contracts.

■ The case of Campbell Soup Company v. Wentz, 3 Cir., 172 F.2d 80, is cited by defendants in support of their contention that the contracts in question, while valid, are unfair and therefore unenforceable in equity.

The contention, we think, is without merit.

The provision which the court, in Campbell Soup Company v. Wentz, supra, considered the severest was that which excused Campbell Soup Company from accepting carrots under certain circumstances and which prohibited the farmer even under such circumstances from selling his carrots elsewhere unless Campbell agreed. The contracts in question were altered somewhat in this respect and contained no such prohibition.

All of the provisions of the contracts herein are mutual and benefit the farmers and the Company equally. For example, the provision relating to contingencies exonerates both the growers and Campbell of default or delay in certain circumstances.

The Court of Appeals in the Wentz case, supra, made mention of the provision in the contract before it specifying that Campbell's determination of conformance with specifications would be conclusive. This provision has been eliminated in the present contracts. Conformance now depends on standards established by the United States Department of Agriculture, and grading is performed by graders licensed by the United States Department of Agriculture and assigned to the loading platforms by the State Department of Agriculture.

The present contracts remove entirely from the discretion of the plaintiffs the determination of the acceptability of the quality of the tomatoes.

Finally, the Court of Appeals in the Wentz case, supra, made mention of the fact that the contract before it had a provision for liquidated damages for breach of the contract by the farmer but no provision for liquidated damages or any other damages for breach of contract by Campbell. The contracts here involved contain no provision with respect to liquidated damages.

Thus, the present contracts are not subject to the several criticisms directed at the carrot contract by the Court of Appeals. They are in our judgment fair and enforceable in equity. See Hunt Foods, Inc., v. O'Disho, D.C., 98 F.Supp. 267; Curtice Brothers Company v. Catts, 72 N.J.Eq. 831, 66 A. 935 and Campbell Soup Company v. Schrider,[1] Superior Court of New Jersey, Chancery Division, Burlington County, Docket No. C-2-52, Vincent S. Haneman, J.

## Conclusions of Law.

1. This Court has jurisdiction of these actions because diversity of citizenship between the plaintiffs and the defendants is present and the amount in controversy exceeds $3,000 exclusive of interest and costs.

2. Campbell Soup Company is a third-party beneficiary of the contracts in question.

3. Campbell Soup Company is the real party in interest and is therefore a proper party-plaintiff.

4. Joseph Campbell Company which entered into the contracts on behalf of the Campbell Soup Company has the right to join in these actions and is therefore a proper party-plaintiff.

5. The contracts entered into by Joseph Campbell Company and the defendant farmers are valid, fair and enforceable in equity.

6. The defendant farmers have breached their contracts by selling to buyers other than the plaintiffs a substantial portion of the tomatoes picked from the acreage which said defendant farmers contracted to grow exclusively for the plaintiffs, and by failing to deliver to plaintiffs the tomatoes picked by them from the said acreage, as called for by their said contracts.

1. No opinion for publication.

216

7. The defendants Diehm and Barrage had knowledge that the defendant farmers, Martin and Stauffer, had entered into written contracts with Joseph Campbell Company and despite that knowledge purchased tomatoes from the said Martin and Stauffer at a price considerably in excess of the contract price, thereby aiding, abetting and encouraging them to breach their contracts with the plaintiffs.

8. The plaintiffs come into Court with clean hands.

9. Unless the defendant Farmers are enjoined from breaching their contracts with the plaintiffs and are required to deliver the tomatoes contracted for to plaintiffs, the plaintiffs will sustain immediate, substantial and irreparable loss, injury and damage.

10. Unless the defendants Diehm and Barrage are enjoined from purchasing tomatoes from farmers under contract with the plaintiffs in violation of said farmers' contracts, the plaintiffs will sustain immediate, substantial and irreparable loss, injury and damage.

11. Plaintiffs have no adequate remedy at law.

12. A permanent injunction will issue restraining the defendant farmers who are under contract to sell their crops to the plaintiffs from breaching their contracts and restraining the defendant brokers from inducing or participating in the breaching of the defendant farmers' contracts.

13. The complaints are accordingly sustained.

An order pursuant to the foregoing opinion will be prepared and submitted.